ANN FITZPATRICK, by Guardian, etc., Appellant, *v.* HENRY W. SLOCUM et al., Respondents.

Ministerial officers can only be made liable to an individual for damages caused by an alleged nonfeasance upon proof showing an omission on their part to perform a plain duty devolved upon them by law.

The commissioners appointed under the act of 1866 (Chap. 826, Laws of 1866) to grade and improve Union street in the city of Brooklyn, in the prosecution of the work constructed a swing-bridge on the street across Gowanus canal, and made and filed their report, and so transferred the bridge to the common council, as required by the act. No barriers were constructed to protect persons in the street from falling into the canal when the draw was open. Plaintiff, in endeavoring to save an infant brother who was about to go upon the bridge just as it was being swung open, slipped between the sidewalk and the bridge and was injured. In an action against defendants, the commissioners of the department of public works, to recover damages, it appeared that at the time of the accident the bridge and street were in the same condition as when transferred to the city, and that it was in charge of a keeper appointed by the police commissioners. Said keeper had previously notified the assistant engineer attached to the board of city works that the place was dangerous, and that two accidents had happened. *Held*, that defendants were not liable; that assuming they could be made liable for damages sustained by reason of defects negligently suffered to exist in a street by virtue of the provisions of the city charter of 1873 (Title 14, chap. 863, Laws of 1873), conferring upon the commissioners of said department the control and care of the city streets, no such liability was incurred here, as the street was in no sense out of repair, and the danger arose simply from the opening of the bridge by a keeper not under the control of defendants, but appointed by and under the control of the police board (see said charter, § 62, title 11), and defendants had no authority to appoint keepers to guard the approaches when the draw was open.

Also, that no liability was imposed upon defendants by the provisions of the act of 1874, amending said charter (§ 31, chap. 589, Laws of 1874) which

requires the commissioners of the city works, in case any street becomes dangerous, to examine and repair the same, as neither the street nor the bridge were dangerous of themselves and were only made so by operating the latter.

*It seems* that the provision of said charter (§ 27, title 19), providing that the city shall not be liable for the misfeasance or nonfeasance of its officers, but that the officer guilty thereof shall be liable, does not exempt the city from liability for failure to discharge a duty resting upon it, and which it has not devolved upon any of its officers, and that the liability for not guarding the bridge sufficiently when it was being operated for public use rested upon the city, and the remedy is against it.

*Gray* v. *City of Brooklyn* (2 Abb. Ct. of App. Dec. 267), distinguished.

(Argued November 29, 1881 ; decided June 13, 1882.)

APPEAL from judgment of the General Term of the City Court of Brooklyn, entered upon an order made July 15, 1880, which affirmed a judgment in favor of defendants, entered upon an order dismissing the complaint upon trial.

The nature of the action and the material facts are stated in the opinion.

*William G. Cooke* for appellant.    The fact that the bridge was built by a commission appointed by the legislature did not relieve the city or its officers from responsibility for its condition. (*Clifford* v. *Dam*, 81 N. Y. 52 ; *Congreve* v. *Morgan*, 18 id. 84 ; *Robinson* v. *Chamberlain*, 34 id. 389–390 ; *Brown* v. *C. & S. R. R. Co.*, 12 id. 486 ; *Sewell* v. *City of Cohoes*, 75 id. 45.)    The board of city works is directly responsible for the dangerous condition of the bridge.    (Laws of 1873, chap. 863, title 14, § 1, subd. 3 and 10, § 3, subd. 1 ; *Sewell* v. *City of Cohoes*, 75 N. Y. 45, 54 ; *Adsit* v. *Brady*, 4 Hill, 630, 633 and note ; *Hyatt* v. *Trustees of Rondout*, 44 Barb. 285 ; 41 N. Y. 619 ; *Springer* v. *Dwyer*, 50 id. 21 ; *Thayer* v. *Marsh*, 75 id. 342 ; *McKnight* v. *Devlin*, 52 id. 399, 404 ; *Clemence* v. *City of Auburn*, 66 id. 334 ; *Morgan* v. *Skiddy*, 62 id. 321 ; Laws of 1874, chap. 589, § 31.)    It having been defendants' duty to keep this bridge and the adjacent street in safe condition, there was sufficient evidence given to carry the case to the jury upon the question of their

negligence. (*Hyatt* v. *Trustees of Rondout*, 44 Barb. 385; *Healy* v. *The Mayor*, 3 Hun, 708–9–10; *Hover* v. *Barkhoff*, 44 N. Y. 113; *Requa* v. *City of Rochester*, 45 id. 129.) No notice was necessary under the circumstances of this case. (*Todd* v. *City of Troy*, 61 N. Y. 506; *Hover* v. *Barkhoff*, 44 id. 113; *McCarthy*, v. *City of Syracuse*, 46 id. 194; *Requa* v. *City of Rochester*, 45 id. 129.) Want of funds is no defense; it was defendants' duty to obtain or at least apply for them. (*Hover* v. *Barkhoff*, 44 N. Y. 113.) A child seven years of age is not to be held to so strict a rule as to precaution as an older person; and it is to be submitted to the jury to determine what degree of care should be required of her. (*O'Mara* v. *H. R. R. Co.*, 38 N. Y. 445; *Thurber* v. *H. B. R. R. Co.*, 60 id. 326; *Eckert* v. *L. I. R. R. Co.*, 43 id. 502.) The rule that a child *non sui juris* by reason of its tender years, who is negligently permitted to run at large, is chargeable with the carelessness of its parents, and cannot recover for injuries inflicted through the negligence of others, is not applicable to this case. (*Thurber* v. *H. B. R. R. Co.*, 60 N. Y. 326, 332; *Drew* v. *Sixth Avenue R. R. Co.*, 26 id. 49; *McGarry* v. *Loomis*, 63 id. 104.)

*Wm. C. De Witt* for respondents. The defendants were not responsible for defects, if any existed, in the construction of the bridge where the accident occurred. (Laws of 1868, chap. 826, §§ 1, 2, 3.) If there was any official negligence, it was the neglect on the part of the department of police to furnish a sufficient number of keepers to manage the bridge with safety, which contributed to cause the accident and consequent injury of the plaintiff. (Laws of 1873, chap. 863, title 11, § 62.) The ordinary powers of the commissioners of city works to repair bridges and streets would not authorize the initiation of a radical alteration of a street improvement originated by the legislature, completed by a commission appointed by the legislature, and in that state handed over to the common council. (Laws of 1873, chap. 864, title 16, § 1, subd. 3, 8; Laws of 1873, chap. 963, title 14, § 1, title 2, § 13, subd. 4, § 26, title

18, § 14; Charter 1873, title 4, § 21.) A specific appropriation by the common council was required. (Charter of 1873, title 6, § 1; *Garlinghouse* v. *Jacobs*, 29 N. Y. 297.) The plaintiff herself was guilty of contributory negligence. (*Hatfield* v. *Roper*, 21 Wend. 615.)

EARL, J. This action was brought against the defendants to recover damages sustained by the plaintiff in consequence of injuries received by her at the Union street draw-bridge in the city of Brooklyn. The bridge was constructed upon Union street across the Gowanus canal by commissioners appointed under the act, chapter 826 of the Laws of 1866. The commissioners appointed by that act were required to grade, pave and improve Union street according to a plan to be adopted by them, a part of which plan was a draw-bridge over the canal; and it was provided that after they had completed the improvements they should make a report to the common council of the city with a map and profile of the street as laid out and established by them, which were to be filed in the office of the street commissioner of the city, and that thereupon the street should be a public street and highway of the city and deemed to have been transferred to the common council and subject to its control in the same manner as other streets and avenues of the city. Under that act the street was improved and the bridge constructed and the report was made and filed as required, and thus the street and the bridge were transferred to the city.

It is provided in section 62 of title 11, chapter 863 of the Laws of 1873, that "The board of police shall appoint suitable persons as keepers of all bridges in the city of Brooklyn who shall perform all the duties and be subject to the regulations and ordinances of the common council. The said persons so appointed shall be under the direction and control of the board of police and excise and may be superseded at any time by the said board."

The bridge was built in 1866. It was about one hundred feet long and thirty feet in width, having two carriage-ways

and two foot-paths. Under the center was a pier upon which the bridge revolved. When it was swung open to allow a vessel to pass it stood at right angles with the street, parallel with the canal, leaving nothing to protect persons in the street which leads off directly into the water. There were no barriers of any description upon the street or sidewalk. The bridge and street were in the same condition as they were when transferred to the city upon the completion thereof by the commissioners appointed under the act of 1866.

The plaintiff, an infant, resided with her parents two doors from Union street and one block from the bridge. On the 10th of May, 1877, she left her home and started down Union street to look for her brother, a child four years old. When she discovered him he was going toward the bridge which was being swung to let a vessel pass. She followed and overtook him just as he was about to get on the bridge and she caught hold of him as he was stepping on and in doing so her foot slipped in between the sidewalk and the bridge and she sustained very serious injuries. Previous to this accident the keeper who was in charge of the bridge gave notice to the assistant engineer attached to the board of city works that the place was dangerous and unsafe and that two accidents had already occurred there. This notice was given at least six months before the plaintiff was injured.

The defendants were sought to be held liable because they were commissioners of the department of city works, under title 14 of chapter 863 of the Laws of 1873. By section 1 of that title it is provided that the commissioners shall have charge and control, subject to the direction of the common council, of opening, altering, regulating, grading, regrading, curbing, guttering and lighting streets, avenues, places and roads, flagging sidewalks and laying crosswalks, of paving and repaving and cleaning streets, avenues and places, and keeping the same clear of encroachments, obstructions and incumbrances; of the construction, altering and repairing of public structures, buildings and offices and all other public works under the care of the department; and it is further provided

that they shall have an annual salary. The claim on the part of the plaintiff is that, by virtue of the powers thus conferred upon the commissioners, they were responsible for the safe condition of the streets and bridges of the city.

At the time of the accident the bridge was actually in charge of one keeper appointed by the police commissioners. The defendants were ministerial officers, and before they can be made liable to any individual for damages caused by an alleged nonfeasance, the proof must show that they omitted to discharge a plain duty which the law devolved upon them. Assuming that they could be made liable for damages sustained by an individual by reason of defects negligently left or suffered to exist in any of the streets or bridges of the city, here Union street was in no sense out of repair. As a street for public travel it was in perfect condition, and the bridge over the canal was not defective, but was in all respects suitable for the purpose for which it was constructed. The street and bridge were completed by the commissioners appointed to construct them, and they were in as good condition at the time of the accident as when they were turned over to the city and to the charge of the commissioners of city works. The danger to which the plaintiff was exposed was caused by operating the bridge by the keeper appointed by the police commissioners. When the bridge was closed it was perfectly safe. When open children and other imprudent persons might walk from the street into the canal; but that was because the draw was opened by the keeper who was not under the control of the defendants. It is not plain from the facts appearing in this case precisely what the duties of the keeper of such a bridge are. They must depend somewhat upon the structure of the bridge and its appurtenances. He may be simply required to operate the bridge, or the duty may also rest upon him to guard the approaches when the draw is open. If the latter duty rested upon the keeper of this bridge, then the police commissioners should have appointed a sufficient number of keepers, if one was not sufficient, to properly discharge that duty.

It is said that the defendants ought to have built barriers at

both ends of the bridge which could have been closed when the draw was open; but who could be there to open and close them? The barriers would be of no use without some persons in charge of them, to open them when the draw was closed, and to close them when the draw was open, and I do not find any thing in the statute which made it the duty of these commissioners, or which gave them the power to appoint keepers of any barriers which they might erect. And again if it was requisite to have keepers of barriers, then the barriers were unnecessary and it would have been sufficient to have stationed a person at each end of the bridge to watch and take care when the draw was open. If there had been a sufficient number of keepers of the bridge the bridge could have been sufficiently guarded so that no accident of the kind which occurred to the plaintiff could have happened. But I am of the opinion that the defendants are not guilty of nonfeasance for not appointing such keepers. The power to appoint them was conferred upon another department of the city.

I can, therefore, find no ground based upon statutes so far referred to for imposing responsibility for this accident upon the defendants.

It is claimed also on behalf of the plaintiff that the defendants are liable to her in consequence of a duty imposed upon them by section 31 of chapter 589 of the Laws of 1874, which provides that "in case any street, public building, highway, sidewalk, crosswalk or bridge shall become dangerous, the commissioners of the city works shall examine the same, and with the approval of the mayor shall cause the same to be repaired or removed, provided that the expense of such repair or removal shall not exceed in amount the sum of $1,000 in any one case, and to meet such expenses the comptroller shall issue certificates of indebtedness, the payment of which shall be provided for in the next annual budget." Here the street did not become dangerous, and the bridge was not dangerous. It was operating the bridge that made it dangerous, and that section plainly had reference to no such occurrence. There was nothing in this

street to repair or remove; the street and the bridge were in perfect repair, and all that was needed to guard against every danger was that the draw should be operated with proper care and vigilance and the bridge kept guarded when the draw was open.

The claim is made on the part of the plaintiff that if these defendants are not liable to her then she has no remedy for the injuries which she has sustained, and our attention is called to section 27 of title 19 of chapter 863 of the Laws of 1873, which provides that "the city of Brooklyn shall not be liable in damages for any misfeasance or nonfeasance of the common council or any officer of the city or appointee of the common council, of any duty imposed upon them, or any or either of them, by the provisions of this act, or of any other duty enjoined upon them, or any or either of them, as officers of government, by any provision of this act, but the remedy of the party or parties aggrieved for any such misfeasance or nonfeasance shall be by *mandamus* or other proceeding or action to compel the performance of the duty, or by other action against the members of the common council, officers or appointee, as the rights of such party or parties may by law admit, if at all." Under this section it is said that no liability in a case like this can be enforced against the city, and that the only remedy for the party injured is against some one or more of the city officers. We are of opinion that the exemption created by this section is not so broad as claimed. There must be a remedy in such a case, where one is injured without fault of his own by a defect in one of the streets or bridges of the city, either against the city or some one of its officers. The primary duty to keep its streets and bridges in safe condition rests upon the city, and there is a general obligation upon it to use proper care and vigilance in putting and keeping its streets and bridges in such condition, and unless that duty has been plainly devolved upon some officer or officers of the city against whom a remedy for nonfeasance can be had, the remedy is against the city upon its obligation. That section does not exempt the city from liability to discharge a duty resting upon it and which it has not devolved

upon any one of its officers. If the commissioners of city works are not liable, as we hold they are not, and if there is no remedy against the police commissioners, for not appointing and keeping at this bridge sufficient keepers (and we are also inclined to think a remedy against them would fail), then the remedy is against the city upon its primary obligation to keep its streets and bridges in a safe condition, and for not guarding this bridge sufficiently when it was operated for public use.

The views here expressed are not in conflict with any thing decided in the case of *Gray* v. *The City of Brooklyn* (2 Abb. Ct. App. Dec. 267). It does not appear very clearly upon what ground that case was decided. It was a sufficient defense to the action that there was no negligence proven which was chargeable to the city; but if more than that was decided in order to exempt the city from liability, it was merely that where a plain duty was devolved upon certain officers, any one injured by a non-performance or imperfect performance of that duty should take his remedy against the officers and not against the city. It was not decided that where an absolute duty rests upon the city one who suffers injury from non-performance of that duty cannot, in any case, have his remedy against the city.

We have therefore reached the conclusion, not without doubt and hesitation, that the nonsuit was properly granted, and that the judgment should be affirmed, with costs.

MILLER, J. (dissenting). The defendants were commissioners of city works in Brooklyn, and the plaintiff claims to recover damages for injuries sustained by reason of the dangerous condition of a bridge which, it is alleged, it was the duty of the defendants to keep in repair and in a good and safe condition. The liability of the defendants is claimed to exist by virtue of the city charter (Chap. 863, Laws of 1873), which, it is insisted, expressly confides to this department the care of bridges. By title 14, section 1 of said charter, provision is made for organizing a department of city works consisting of a president and commissioners, and it is declared that " said commissioners shall have charge and control, subject to the directions of the

common council," of various matters which are enumerated, and under subdivision 10, among other things, of the construction, altering and repairing of public structures, buildings or offices and all other public works under the care of said department." The power here conferred is quite full, but nevertheless is subject to the control of the common council. Although the board of city works is one of the departments recognized in the charter (Title 3, § 2) as well as in title 14, § 1, *supra*, it is, however, subject, to some extent at least, to the legislative power which is vested in the common council, which has authority over the affairs of the city and is "to supervise the affairs of all the departments and offices herein named." (Laws of 1873, § 13, subd. 2.) The qualification placed upon the powers of the commissioners would seem to put them under the control and direction of the common council to a certain extent, and in the exercise of the functions conferred by the charter, that body, if they deemed it advisable, could have the right to legislate as to the management and control which should be exercised over the same for the public benefit, although their powers were not absolute and the commissioners still retained certain independent functions.

The bridge was built under the directions of a board of commissioners by virtue of a special act of the legislature (Chap. 826, Laws of 1868) and in accordance therewith, upon the improvement being completed in 1871 or 1872, a report thereof was made to the common council, and it was provided that thereupon it would be deemed to have been transferred to said common council. According to the evidence at the time of the accident it was in the same condition as when handed over, and no doubt was subject to the same general rules and control as other structures of a similar character. In this connection some other provisions of the charter may properly be adverted to, and under title 11, section 62, the board of police were authorized to appoint suitable persons as keepers of bridges, who were to perform all the duties, subject to the regulations and ordinances of the common council, and a keeper of this bridge was appointed accordingly. It is thus apparent that

it was the duty of the police department to provide the necessary keepers to manage and control the bridge in question, and had this been effectually done it is most probable that the accident in controversy would not have occurred. The bridge was supposed to have been in a completed condition when delivered, and no repairs were required so far as appears, but accidents may have been guarded against either by an additional keeper or by a gate or some obstacle or barrier which would prevent persons from being injured. Were the commissioners responsible that this was not done?

The common council, as we have seen, exercised a general direction and control over the department of public works and a supervision over the same. The city was liable for any contracts except, among other things, for the *repaving* of streets, and all contracts, other than for the purposes excepted, exceeding the sum of $250, were to be made as provided by Laws of 1873, title 17, § 1, and the common council were required to make the necessary appropriation of money to keep the streets in repair. (Title 2, §§ 20 and 21.) Having in view the different provisions defining the power of the defendants, and those conferred upon the common council under the various statutes to which reference has been had, I cannot resist the conclusion that the commissioners had authority over the bridge in question. Their general powers cannot be questioned, and the restriction imposed, which places them under the control and direction of the common council, did not prevent their making the necessary arrangements to guard against accidents. Suppose the bridge had got out of place or had become unsafe on account of weakness or insecurity, or by accident, can there be any question that it was the duty of the commissioners to see to it and to provide safeguards for the protection of the public? The common council's duty was supervisory, but theirs was a positive duty. If the amount required for repairs was less than $250, then they had the power to expend that sum. If beyond that sum, they should have applied to the common council for the necessary funds. They did neither, and hence were not relieved from responsibility, and it was a ques-

tion of fact for the jury whether, under all the circumstances, they were negligent. Under the Laws of 1873 (Title 17, § 2), the commissioners were bound, with the approval of the mayor, in case any bridge "shall become dangerous" to cause the same to be repaired, and I am unable to perceive why this provision is not applicable to the case of a bridge which had, on a previous occasion, been the cause of accident of which notice had been given.

Although the police commissioners had appointed a keeper, it was confessedly an insufficient and an inadequate protection, and the defendants should have seen either that some effectual mode was adopted by appointing a sufficient number of keepers for such a purpose, or that some other means were provided by the interposition of some barrier or obstacle for protection from accident. As to this, however, it was for the jury to determine in view of the facts.

Nor can it be urged, we think, that such an appropriation could be said to be a local improvement within the meaning of the charter. (Title 18, § 21.)

If, however, a specific appropriation was required, it should have been applied for to avoid the allegation of negligence. The fact that the bridge was built under a special act of the legislature and handed over to the common council does not exonerate the defendants from the obligation imposed upon them or place it in any better or different condition than other similar city structures.

Nor is it entirely clear that the plaintiff was guilty of contributory negligence. As the case stood, we think the judge erred in granting the nonsuit.

The judgment should be reversed and a new trial granted, with costs, to abide the event.

All concur for affirmance, except MILLER, J., dissenting.

Judgment affirmed.